## HOUSTON v. STANTON AND STANTON.

1. Articles of agreement were entered into, between three brothers, which recited that they had *previously agreed to be equal sharers and partners in the product of their own labor and those under their care ; and to bear equally the expense of carrying on a farm, raising stock, purchasing land, negroes*

*and other property*, whether *jointly* or *individually*. The articles then provided for the continuance of the partnership, and extended it to all business in which either of them might engage, and stipulated that if either of the brothers died before a final adjustment and division of the property owned by them *jointly* or *individually*, the survivor or survivors (if one, or two of them died before such adjustment and division) should *heir* or inherit all the property, after a liquidation and final settlement of the debts or lawful claims against all or either of them: *Held*, that under this agreement, lands purchased upon *joint account*, or in the name of the brothers *individually*, inured to the benefit of the partnership; that if one of the partners purchased lands in his own name, and sold them, taking a note to himself for the purchase money, such note vested in the partnership, at least in equity, and upon the death of the payee, the surviving partners might file a bill in their own names for the enforcement of the equitable lien against the lands.

2. The lien of the vendor of land is a secret trust, and although it will be preferred to any other subsequent equal equity, unconnected with a legal advantage, or equitable advantage which gives a superior claim to the legal estate, will be postponed to a subsequent equal equity, connected with such advantage. If therefore a vendee who has a perfect conveyance sell the land to another person who has no notice that he has not paid the purchase money, and take from the purchaser a note for the purchase money, which is assigned for a valuable consideration by the vendee, before the sub-vendee, or the assignee has notice that the original vendor has not been paid, the equitable lien of the latter will be lost, and the assignee will be entitled to the money due on the note. And a different rule of law will not be applied, although the sub-vendee after he was informed of the non-payment by his immediate vendor, said he would not pay his note, unless he was made safe; nor will the assignee's right to retain the money be impaired because he gave to the maker of the note an indemnity to induce him to pay it.

3. The possession of a deed by the vendee is *prima facie* evidence that it was delivered to him by his vendor, and the *onus* lies upon those interested to prove the reverse to repel the presumption by proof.

Writ of Error to the Court of Chancery sitting at Livingston.

In December, 1843, the defendants in error filed their bill, setting forth that on the 20th November, 1842, they, together with Rufus W. J. Stanton, since deceased, executed a writing under their respective hands and seals, whereby, after reciting, among other things, that they were jointly inter-

ested in a farm carried on by them, it was stipulated, if either one or two of them die before a final adjustment and division of the property then owned by the parties jointly or individually, all the property, both joint and individual, of the party thus dying, should vest in the survivor or survivors, subject to the payment of the just debts of the deceased.

Elihu Moffitt, late of the county of Sumter, contracted with R. W. J. S. for the purchase of a half quarter section of land situated in that county, and which is particularly described in the bill, for the sum of fifteen hundred dollars, payable in three equal instalments of five hundred dollars each, payable on the first day of January, 1840, '41 and '42; and delivered to the vendor his three several promissory notes, due at these periods, each for the amount of an instalment.   Simultaneously with the making and delivery of these notes, the vendor executed to the vendee a bond in the penalty of three thousand dollars, conditioned to be void if the obligor conveyed to the obligee title to the land upon the payment of the purchase money.

Subsequently to his purchase, Moffitt bargained and sold to Houston, the defendant, a tract of land embracing his purchase from R. W. J. S.   Previous to the consummation of the contract, he applied to R. W. J. S. to make him a deed for the half quarter section, and promised to secure the purchase money by good personal security : it was accordingly agreed, that the security should be given and the deed executed by an appointed day.   Moffitt and his vendor met on that day, but the persons who were expected to become the sureties did not attend: the vendor had prepared a deed, which purported to convey the land in question to Moffitt, dated on the first day of May, 1839, but in point of fact subsequently executed ; this deed was placed in the hands of Moffitt, under a promise by him, that he would in a few days secure the payment of the purchase money by new notes, in which Benjamin D. Turner and Henry G. Turner would be liable as sureties and joint makers, and until this was done, the title should not pass from the vendor.   R. W. J. S. being informed a few days after by B. D. Turner, that he would not become a surety for Moffitt, shortly thereafter demanded the deed of the latter, and was informed that it

was placed in the hands of B. D. T. as a justice, with instructions to retain it until he (R. W. J. S.) was made safe and satisfied, and then to take his acknowledgment and have it recorded; if satisfactory security was not given, then he was to deliver it to him, (the grantor.)

Before the close of the year 1839, Moffitt died, and thereupon R. W. J. S. demanded of B. D. T. the deed [placed in his hands, who replied, it was placed in his hands to obtain his (the grantor's) acknowledgment, and have it recorded, but knowing that Moffitt was in doubtful circumstances, and that he had not paid the purchase money, he had not asked him to acknowledge it; afterwards Moffitt told him not to have it recorded until the grantor was secured according to their agreement. In December, 1840, B. D. T. delivered the deed to David Russell, who in a few days thereafter had it recorded, upon the probate of W. D. Robbins, the only subscribing witness.

On the 25th October, 1839, Moffitt conveyed to the defendant the lands he had undertaken to sell him—the purchase being made on a credit, and the notes of the latter being taken for the payment of the purchase money amounting to $8,000.

Shortly after Moffit's death, the defendant informed R. W. J. S. that unless he did something about the land he sold M. he would lose it—stating that he had applied to B. D. T. for the deed, and he refused to give it up. R. W. J. S. then directed him not to pay any part of the purchase money, until what was due him (R. W. J. S.) was discharged; to which the defendant replied, that he would not until secured. At the time this conversation took place, the defendant owed $4,000 upon his purchase of Moffitt. Upon another occasion, the defendant gave the same assurance that he would not pay.

R. W. J. S. in his lifetime, always claimed a lien upon the land which he sold to Moffitt, and since his death the complainants have continued to make the same claim—and of the non-payment by Moffitt, the defendant had notice when he made his purchase.

Moffitt died intestate and insolvent, and consequently no

administration has been granted upon any estate he may be supposed to have left.   R. W. J. S. died in 1843, and his estate has not been administered on.   At the time of his death he owed no individual debts, and no adjustment or division of the property, owned individually or jointly, by himself and complainants had been made prior to that time ; consequently the complainants, in virtue of the contract between R. W. J. S. and themselves, have become proprietors of the notes which the intestate held against Moffitt.   Previous to the death of R. W. J. S. he filed a bill against the defendant for the enforcement of his equitable lien, which that event abated, as the complainants were not made parties.

The bill prays an account of what may be due upon the purchase made by Moffitt, of R. W. J. S., and that the land sold by the latter to the former may be subjected to the payment thereof ; that Houston be made a defendant, and such other relief as may be proper to be granted.

The defendant answered, admitting his purchase of lands of Moffitt, in Oct. '39, in which were included the half quarter section against which the complainants are seeking to enforce their supposed lien ; for which he paid $4,000, and gave him two notes, payable in one and two years after date ; the one for $2,000, and the other for $2,300.   These notes, about the time they were made, were indorsed and assigned to David Russell, in his own right, or as the agent of the Massachusetts and Alabama Land Company ; of which the defendant was informed previous to Moffitt's death, an event which he thinks occurred in August, 1840.

Defendant declares his ignorance of what transpired in respect to the execution and delivery of the deed by R. W. J. S. to Moffit, its delivery to Turner, registration, &c.—affirms that he made his purchase without any notice or suspicion of the lien now set up ; that it was not until after he had paid the four thousand dollars, and he thinks all but the last note, that he was informed of it.   Before paying that note, he called on R. W. J. S. to learn what proceedings he should take in the matter, who then declined to interpose, assented to the payment of, and in effect instructed him to pay the last note. The defendant accordingly paid the same without any sus-

picion that an attempt would be made to enforce such a lien.

Several depositions were taken at the instance of the complainants. The articles of co-partnership between the Stantons, and the deed from Rufus W. J. Stanton to Elihu Moffitt, were proved to have been executed.

A decree was rendered in which the chancellor declares— 1. That there are sufficient parties to the suit. 2. That the equity of the bill is unquestionable. 3. That the allegations of the bill have been established by the proof. 4. That the defendant was a purchaser of the lands in question with notice of the complainants' equity, or at least received such notice previous to the payment of the purchase money by him to Moffitt's assignee. Thereupon it was referred to the register to ascertain how much of the purchase money remained due and unpaid upon the sale by Stanton to Moffitt: *Further*, if the amount thus ascertained to be unpaid, be not paid on the confirmation of the register's report, it was adjudged and decreed that the defendant be foreclosed from all right and equity in and to the half quarter section of the land in the pleadings mentioned; and that the register sell the same at public auction, after advertising the sale in the manner the law requires of sheriffs where real estate is sold under execution. It was further ordered, that the register apply the proceeds of the sale to the payment of the complainants' debt, with the interest, and costs of this suit. If there be a surplus remaining after such payment, the register was directed to pay it to the defendant. *Lastly*, that the purchaser be let into the possession, and the title to the land ordered to be sold, be vested in him.

The register reported that there was due upon the sale of Stanton to Moffitt the sum of $2033 31; and two days having elapsed and no objection being made to the report, the same was confirmed.

J. Bliss & Baldwin, for the plaintiffs in error, contended that the allegation that the deed from Stanton to Moffitt was delivered conditionally, is denied by the answer, and not established by proof. To show that Moffitt or his vendee held

53

the premises in question as a trustee for the vendor of the former, until the purchase money due him was paid, notwithstanding he had made an absolute conveyance, requires the most convincing proof.

It is shown by the bill itself, that the vendor, Stanton, did not inform Houston that any part of the purchase money due him from Moffitt was unpaid until after Houston had paid his note of $3500—which matured in 1840; before this time, Russell states Moffitt had transferred the remaining notes which were payable in 1841 and 1842. Previous to the notice to Houston, it is not pretended that an equitable lien could have been enforced, and it is insisted that the *bona fide* assignee of Moffitt holds the notes which he acquired previous to that time, divested of the lien in the same manner that a purchaser without notice would hold the land. [1 Johns. Ch. Rep. 298; 3 Leigh's Rep. 597; 5 Stewt. & P. R. 216; 1 S. & M. Rep. 197.]

The bill should have been filed earlier, and Houston injoined from the payment of the purchase money, at least of an amount equal to his demand. A mere notice by Stanton that he was unpaid would not have availed as a defence against Moffitt, much less would it be good against his assignee. This suit was not commenced until the last note was paid.

Again: the contract between the complainants and Moffitt's vendor, in virtue of which the former claims, was not entered into until 1842, after Houston had paid the purchase money. Under that contract, the lien did not pass to complainants, even if it existed in the vendor. [5 Ala. Rep. 363.]

It should have been shown by the complainants, if they were entitled to enforce the lien, that R. W. J. Stanton died before there was a division of the property of the partners, or an adjustment of their interests. If all other arguments fail, it is insisted that the assignee of Houston's notes should have been made a party.

R. H. Smith, for the defendants, insisted that in all cases of the sale of land, the vendor has a lien for the payment of the purchase money, unless there are circumstances indicating

a contrary intention. [1 Stewt. & P. Rep. 237, 238.] It devolves upon the purchaser to prove that this lien has been waived or displaced; if upon this point there be a doubt, its continuance will be intended. [2 Story's Eq. 470.] The giving a note payable at a future day does not impair the lien. [Id. 474.]

A sub-purchaser without notice takes the land divested of the lien; but notice is not confined to the time when the contract was entered into, if he has notice before he receives a conveyance, or pays what he has stipulated, he will stand in the condition of his vendor. [5 Stewt. & P. Rep. 238; 2 Fonb. Eq. b. 2, ch. 6, § 2, note C; 3 P. Wms. Rep. 307; 1 Atk. Rep. 384; 2 Id. 630; 3 Id. 304.] Such second purchaser takes the estate *cum onere*, and the first vendor may proceed against him for the purchase money due by him, or enforce the lien against the land. [2 Story's Eq. 483, § 1232.]

So far as the deed acknowledges the receipt of the purchase money, it is not conclusive upon the vendor, and it will be competent to show that nothing has been paid, or that the consideration was greater or less than it recites. A receipt indorsed upon the deed is inconclusive, like all other receipts, and may be disproved by the vendor. [2 Phil. Ev. C. & H's notes, 217; 3 Id. 1441; 4 Stewt. & P. Rep. 96; 5 Id. 410; 5 Port. Rep. 505; 1 Stewt. Rep. 529; 1 Ala. Rep. N. S. 310; 2 Story's Eq. 470, 471, and note 1; 5 Ala. Rep. 363.]

No person has administered on the estate of the vendor, Stanton, or Moffitt; consequently, neither of them have a representative to make a party, if it were necessary to bring them before the court. The assignee of Moffitt is not an indispensable party, no relief is prayed against him, or Moffitt's estate, but against the land only; so that the notes made by Houston may be placed out of view, save only for the purpose of showing that they were unpaid for a larger amount than is sought to be recovered in this suit, when he had notice. [Mitf. Plead. 220; 2 Atk. Rep. 510, 551; Story's Eq. Plead. 182, 144, 160.] The complainants, as surviving partners, are entitled to sue—and perhaps as trustees for the benefit of creditors, &c. their right to come into equity without

making the creditors, &c. parties, is defensible.    [Story's Eq.
Plead. 145.]

COLLIER, C. J.—The agreement between the plaintiff
and Rufus W. J. Stanton, contains a recital and stipulation as
follows, viz : " having mutually agreed heretofore to labor in
concert, and be equal sharers and partners in law and equity in
the product of our labor, and those under our care ; and having
agreed to bear, each and severally an equal part in the expense
and debts incurred by carrying on a farm, raising stock, pur-
chasing land, negroes and other property, sometimes jointly,
sometimes individually—Now know ye, and all to whom
these presents shall come, that we, the said Rufus W. J.
Stanton, Hubbard D. Stanton, and Warren G. Stanton, do
hereby agree to still continue and carry on our farm, purchase of
property, and other branch of business in which we, or ei-
ther of us may engage, in joint stock, and be equally liable, and
equal sharers in all profit and loss, attending or accruing from
our joint or individual operations ; and should either of the
brothers of the parties aforesaid, die before a final adjust-
ment and division of the property now owned by us jointly
or individually, the survivor or survivors, if two should die
before said adjustment and division, shall heir or inherit all
the property after a liquidation and final settlement of all the
debts, or lawful claims against us, or either of us," &c.

The questions which arise upon this agreement are
these, is it sufficiently comprehensive to embrace the notes
which the complainants are seeking to collect and make them
part of the partnership property, and are the complainants
entitled to the relief they ask?    The recital in the agreement
is, that the parties had heretofore agreed to labor in concert,
and participate equally in the product of their labor, and
jointly bear the expense incurred by carrying on a farm, rais-
ing stock, purchasing land, &c. " sometimes jointly and some-
times individually." It is then agreed, as we have seen, to
continue the partnership.    The testimony establishes the ex-
istence of a partnership for farming and other purposes com-
mencing in 1833.    One witness testifies that the half quarter
section of land which Moffitt purchased of R. W. J. Stanton,
was the property of the latter jointly, though the legal title

was in the vendor, and that their partnership contract made them alike interested in it. Independently of the written agreement, it may be, that the statute ot frauds would have prevented the successful assertion of the complainants' claim; but the agreement recognizes the existence of a partnership, by which lands purchased on joint account, or in the name of the partners individually, inured to the benefit of all of them. The parol evidence is admissible for the purpose of showing when the joint operations of the complainants and their deceased partner commenced, which we have seen was six years previous to the sale by Moffitt. We therefore incline to think, that the lands in question, whether the legal title was in one or all the partners, vested beneficially in the firm. This being the case, the notes received for the payment of the purchase money; though payable to one *eo nomine*, vested in the partnership, at least in equity.

On the death of one partner, the survivors are entitled to all the *choses in action*, and other evidences of debt belonging to the firm. They must be collected in their name; and they are entitled to the exclusive custody and control of them: the books of accounts are incidents to the debts or choses in action; and whoever is entitled to the one, is of course entitled to the other. The right of action in relation to all partnership demands, is transferred to the surviving partners; but they are liable to account to the representatives of the deceased partner for his share of the partnership property. [6 Cow. Rep. 441; 1 Paige's Rep. 398; 3 Id. 526; 6 Conn. Rep. 180; 7 Mass. Rep. 257; 1 Dall. R. 65, note; 3 Rawle's Rep. 355; 4 Dev. R. 367; 1 Dev. & Bat. Eq. Rep. 524; 4 Ala. Rep. 588; 5 Id. 446; 2 Mass. Rep. 401; 6 Pick. R. 330.]

Mr. Justice Story, in his work on Partnership, (§ 346,) says, *choses in action*, debts and other rights of action of the partnership, belong to the surviving partners; and they possess the sole and exclusive right and remedy to reduce them into possession, although when so recovered, the survivors are regarded as trustees thereof for the benefit of the partnership; and the representatives of the deceased possess in equity the same right of sharing and participating in them, which the deceased partner would have possessed if he had

been living. If then the complainants have made such a case as entitles the holders of the notes to enfore an equitable lien upon the land, which was the consideration of them, the suit is well brought in their names. To the consideration of this question we will now address ourselves.

The lien of the vendor of land for the unpaid purchase money, where it has not been waived, either expressly or by implication, is a right well established in equity; but, that it may be defeated by an alienation to a *bona fide* purchaser without notice is equally clear. [Coote on Mort. 248; 3 Ala. Rep. 302; 7 Id. 318.] In Dufphey v. Frenaye, 5 Stew. & P. Rep. 215, it was held, where a sale of land has been made by a purchaser to a second vendee, for a valuable consideration, without notice of an incumbrance, if none of the purchase money has been paid, chancery will arrest the entire subsequent sale, and sustain the lien of the first vendor, for the purchase money. But the second purchaser will be protected to the extent of all payments made by him previous to notice of the lien or incumbrance; and if the lien is enforced against the land to any extent, it may be that he will be allowed for improvements made on it previous to the notice. To the same effect is 6 Monr. R. 198, 221.

Mr. Justice Story considers the doctrine, that a lien exists on the land for the purchase money, though well settled in equity jurisprudence, is borrowed from the text of the civil law; and is manifestly founded on a supposed conformity with the intentions of the parties, upon which the law raises an implied contract. He therefore concludes that it is not inflexible, but ceases to act, where the circumstances of the case do not justify such an adherence to it. Such a lien "is not of so high and stringent a nature as that of a judgment creditor, for the latter binds the land according to the course of the common law; whereas the former is the mere creature of a court of equity, which it moulds and fashions according to its own purposes. It is in short, a right which has no existence until it is established by the decree of the court in the particular case, and is then made subservient to all other equities between the parties, and is enforced in its own peculiar manner, and upon its own peculiar principles. It is not therefore an equitable estate in the land itself, although

sometimes that appellation is loosely applied to it." [1 Mason's Rep. 191, 212-13-14, 221-2.]

In Bailey v. Greenleaf, 7 Wheat. Rep. 46, it was decided that the vendor of real estate who has not taken a separate security for the purchase money, has a lien for it on the land, as against the vendee and his heirs; but this lien is defeated by an alienation to a *bona fide* purchaser without notice; and it cannot be asserted against creditors holding under a *bona fide* conveyance from the vendee. Whether it could be asserted against the assignees of a bankrupt, or other creditors coming in under the purchaser by act of law, was not determined. It was said, whether the lien of the vendor be established as "a natural equity," or from analogy to the principle, that in a bargain and sale the bargainor stands seized in trust for the bargainee, unless the money be paid; still it is a secret invisible trust, known to the vendor and vendee, and to those to whom it may be communicated. If a vendor relies upon this lien, he ought to reduce it to a mortgage, so as to give notice of it to the world, if he does not, he is in some degree accessory to the fraud committed on the public by an act which exhibits the vendee as the complete owner of an estate on which he claims a secret lien. *Again:* "The lien of the vendor, if in the nature of a trust, is a secret trust; and although to be preferred to any other subsequent equal equity, unconnected with a legal advantage, or equitable advantage which gives a superior claim to the legal estate, will be postponed to a subsequent equal equity connected with each advantage."

It has been holden that a *bona fide* mortgagee of land, without notice of any equitable *lien* in the original vendor, of whom the mortgagor purchased,) is authorized to purchase of the mortgagor a release of the equity of redemption, (even after notice from the vendor,) in consideration of any just claim he may have upon the mortgagor, originating before such notice; but after notice, the lien attaches for so much as he may have actually paid or agreed to pay for such release, over and above the claims for which the mortgage was taken, and which originated before the notice. [4 Hen. & M. Rep. 113.]

In Moore, et al. v. Holcombe, et al. 3 Leigh's Rep. 597,

Moore purchased the land from Hancock, sold it to Franklin, executed a deed to him, received his bonds for the purchase money and assigned them to Murrell and Meem—all which occurred before Franklin had any intimation of the claim of Hancock. The assignees did not take the bonds upon any assurance of payment by Franklin; but the latter, on hearing of the claim of Hancock, determined to retain the purchase money until it should be decided whether the original vendor or the assignees had the best right to it. In this predicament of the case, the court said the question really is, between Hancock and the assignees, which shall have this portion of the purchase money, yet in the hands of Franklin. Does it belong to Hancock by virtue of his implied lien, or to the assignees, who have purchased the lands without notice of the arrears due to Hancock. The judges were all of opinion, that the assignees had the superior right to the money due on the bonds. It was said the equity as against the sub-vendee " is, that he shall pay to the original vendor whatever he himself yet owes to his own vendor. If he owes any thing, he and his land are discharged, upon his paying up the original vendor's demand; and if he owes nothing, neither himself nor his land is in any way responsible." It is then concluded that nothing was due from Franklin to Moore when he received notice of Hancock's claim. Moore had previously sold his bonds " for value to persons who knew nothing of the vendor's pretensions. From the moment of that sale, Franklin ceased to owe Moore any thing. He became the debtor of the assignees; and as he owed Moore nothing, he could be liable to Hancock for nothing." It was admitted that assignees take every bond subject to the obligor's equity against the obligee. Such an equity is against the bond, and intended to avoid it; the equity of the original vendor is not to discharge or vacate, but to enforce the bond for his benefit. The assignees purchased the bond subject to any equity of the obligor against the obligee, but not subject to any supposed equity of the obligee's vendor, of which they had no notice. It was asked, why should not the lien upon the bonds given by the sub-vendee, be lost by a sale of them, without notice, in the same manner that the vendor's lien is lost as to the *land*, by a sale to a subsequent vendee without

notice, and supposed that there was no distinction in the cases. The assignee of the bond it was said had possession of them, and a legal right to sue on them in his own name, and enforce payment; and that this was a legal advantage which equity would not take from a fair purchaser without notice. [2 Johns. Ch. Rep. 441, 479.] It was also said the assignment of the bonds transferred to Murrell & Meem the lien on the lands, which the obligee had before the assignment, and that this lien, thus acquired, was not subordinate in the hands of the assignees to that of the original vendor; and as the assignees were the parties really interested, they should be made defendants to the bill. See 4 Hen. & M. Rep. 113, upon the last point; and upon the general doctrine of equitable lien, 2 Humph. Rep. 248; 4 Wheat. Rep. 256; 2 Wash. Rep. 141; 3 Litt. Rep. 217; 4 Id. 290, 318; 5 Monr. Rep. 287, 312; 3 J. J. Marsh. Rep. 178.]

The allegation of the bill, which denies the delivery of the deed by R. W. J. Stanton to Moffitt, is not supported by the proof. B. D. Turner, a witness examined at the instance of the complainants, testifies that he was a justice of the peace, and that Moffitt delivered to him that deed for the purpose of taking the acknowledgement of its execution, that after it remained in his possession about two months, Moffitt called to inquire whether the acknowledgement had been obtained. Witness then informed Moffitt that he knew the land was not paid for, and being involved in his affairs, he felt a delicacy in calling upon the grantor to acknowledge the deed. Moffitt then instructed witness to hold the deed, until he secured the parties or settled with them. Some short time after the interview narrated, D. M. Russell called on witness for the deed—claiming it as his own, and witness delivered to him.

Witness further testified, that R. W. J. Stanton called on him to know if he could get any pay from Moffitt, and requested him to sign the notes, as Moffitt promised to give H. G. Turner and witness as sureties. Giving to this testimony all the effect that can be claimed for it, and we think it falls short of establishing that there was not an absolute delivery of the deed, or that surety for the purchase money was

54

a condition upon which the delivery became operative. The possession of the deed by Moffitt is *prima facie* evidence that it was delivered to him by the grantor, and the *onus* lies upon the complainants of repelling this presumption by proof—and this they have failed to do.

The defendant positively denies that he was informed of the non-payment of the purchase money by Moffitt to R. W. J. S. until some time after he had consummated his purchase from Moffifitt—in fact, not until he had paid all but the two last instaments. It is proved by the testimony of D. M. Russell and J. Bliss, that at or about the date of defendant's notes, they were assigned to Russell as agent of the trustees of the Massachusetts and Alabama Land Company—that the defendant was present when the assignment was made. Russell further testifies that he never heard of the non-payment of the purchase money due upon the sale to Moffitt, until, (according to his recollection,) this suit was instituted.

Here then, simultaneously with the making of the notes of the defendant, they were assigned by the payee—neither the maker nor assignee being informed that there was an equitable lien on a part of the lands, or any thing of which it could be predicated, at the instance of the person from whom Moffitt purchased. This state of facts brings the case directly within the influence of the decision cited from 3d *Leigh*, which is not only well supported by the reasoning there employed, but is fortified by the principles and illustrations furnished in the citations from 1st Mason and 7th Wheaton. It is unnecessary to re-state the argument here —it has been sufficiently expanded, and satisfactorily shows, that the equity of the complainants, as it existed against Moffitt, cannot be enforced against the land, nor can the defendant be chargeable upon the ground that he was informed of the claim of the complainants before he had completed the payment of the purchase money. Before he received such information, the notes were assigned to a third person who it appears from the evidence had no notice of any equity that could affect his right to receive the money on them. This we have seen gave to the assignee the paramount title, both at law and in equity, to the notes and their proceeds;

consequently left nothing due by the defendant to Moffitt to subject to the complainant's demand.

The declarations of the defendant, after he was informed of the claim set up by the complainants, that he did not intend to pay for the land, until he was made safe, cannot impair the rights of the assignee, or assist the equity of the complainants. Nor can the indemnity which the defendant received from the assignee as an inducement to complete the purchase money, have any effect upon the right of the latter to retain the money. The giving or receiving such an indemnity, neither impliedly nor expressly admitted any thing favorable to the complainants, or prejudicial to the defendant, or the assignee in a controversy with them.

Other questions have been discussed at the bar, but what we have said is decisive against the complainant's right to recover, we have therefore but to add, that the decree of the court of chancery is reversed, and the bill dismissed.