# Strange v. Graham, adm'r &c.

*Final Settlement of Accounts of Administrator of Insolvent Estate.*

1. *Statutory bar to recovery of personal property.*—The exclusive possession of personal property, under claim of ownership, for more than six years, bars any action to recover it or any interest in it by another.

2. *Rights of surviving partner.*—When a partnership is dissolved, and one of the partners dies before the partnership affairs have been settled, the title to all the personal assets is cast on the survivor, and he has a lien on them for the payment of the outstanding partnership debts, and any balance due to himself on settlement of the accounts; and until these debts are paid, the administrator of the deceased partner can not recover any part of the assets from him.

3. *Voluntary conveyance.*—A voluntary conveyance, though void as to existing creditors, is valid between the parties and their privies; consequently, the administrator of the grantor can not recover the property, nor can the creditors of the grantor's insolvent estate charge the administrator with it on settlement of his accounts.

4. *Sale of lands under execution after defendant's death.*—When an execution has been levied on lands during the life of the defendant, they may be sold under the levy after his death; and the sale can not be impeached, in a collateral proceeding, because it was made under a *venditioni exponas,* or because personal notice of the levy was not given to the defendant.

5. *To what party may testify, in suit against administrator.*—On final settlement of the accounts of the administrator of an insolvent estate, the creditors seeking to charge him with the rent of lands which belonged to the intestate, and which the administrator himself had cultivated the last year of the intestate's life, the administrator can not testify, in his own behalf, as to the terms of the contract of renting between himself and the intestate (Rev. Code, § 2704; Sess. Acts 1874-5, p. 252); but he may state that certain bales of cotton, with which he charged himself in his account, were on account of the rent of the lands that year.

APPEAL from the Probate Court of Macon.

In the matter of the insolvent estate of Littleberry Strange, deceased, on final settlement of the accounts and vouchers of Benjamin Strange, the administrator. The said decedent died, intestate, in February, 1875; and his estate was regularly declared insolvent. On final settlement of the administrator's accounts, the creditors sought to charge him with the following items, as assets of the estate, which were not included in his account as stated by himself, namely—an undivided interest in a library of law-books, consisting of several hundred volumes; the rent of a plantation called the "Tate place," during the years 1875 and 1876; and the rent of another tract of land, called the "Ray place," during the year 1876. The evidence in relation to these several items,

and the rulings of the court upon them, are thus stated in the bill of exceptions :

"As to the law library, the following was the evidence : *R. H. Abercrombie* testified, on behalf of the creditors, that the decedent, prior to his going on the bench as circuit judge in 1868, was a copartner with George W. Gunn in the practice of the law ; that there was a large law library, numbering several hundred volumes, in the office of said firm, and used by them in the practice of their profession ; and that a large number of the books, some three or four hundred volumes, were marked *Gunn & Strange,* and *Strange,* in the handwriting of said Strange.    *W. Edwards* testified, in behalf of the creditors : 'Some time in December, 1875, I went to Gen. Gunn's office to buy some law-books, and set apart two hundred volumes, which I desired to purchase ; but we could not agree on the price, and did not trade.   Gunn was in possession of the library.   I think I counted about eight hundred volumes ; and Gunn said, he had about three hundred more in Opelika, belonging to his library.   Gunn said, that he had a right to sell the books ; that the library was the property of Gunn & Strange ; and that there was also a blacksmith partnership of Gunn & Strange unsettled, in which Strange owed Gunn ; and that for this indebtedness he (Gunn) had appropriated Strange's half of the library.' *J. Bilbro,* for the creditors, testified that he went to see Judge Strange, for Judge Cobb, to get the Reports and other books belonging to the office of circuit judge ; that Judge Strange told him, that the books were in his library in Tuskegee, in the office occupied by Gunn ; and that he went to Gunn's office, and got the books he wanted.   To the declaration of the witness as to what Strange said, the administrator objected, and excepted to the overruling of his objection. 'The library,' the witness said, 'was the one used by Gunn & Strange before Strange went on the bench in 1867 ; and the books were in Gunn's office, which was the old office formerly used by Gunn & Strange.   A majority of the books I saw were marked *Gunn & Strange,* some *G. W. Gunn,* some *Gunn, Strange & Armstrong,* and some *Gunn & Willis.*   The books I saw consisted of almost complete sets of Alabama Reports, Paige's Reports, Johnson's Reports, English Common Law Reports, and many fine text-books.   The value of the books I saw I judged to be about $1,500.   Not long after this interview with Gunn, I saw Benjamin Strange, the administrator, who told me, that his father, said decedent, had given his half interest in the old Gunn & Strange library, at the time of his election to the bench in 1867, to John Strange, his son. Said John Strange made a conditional trade with me for his

interest in the books : the condition was, that the books could be got from Gunn, and a good title made. Benjamin Strange said, that the library in Gunn's possession consisted of about fifteen hundred volumes ; and he and John Strange then went to Gunn's office to get the books, but failed to get them. John Strange had then been admitted to practice law as an attorney, and he filed a petition for the partition of the library ; which was resisted by Gunn, and the case is now pending in the Supreme Court.

"*George W. Gunn* testified, on behalf of the administrator, as follows : The decedent and himself had been engaged in the practice of the law as partners for a series of years prior to said decedent's going on the circuit bench in 1867, and used the said law library. Witness had bought with his own funds almost the entire library used by the said firm in 1867. The books were bought after 1856, in which year the library of the firm was destroyed by fire, when the principal part of the business portion of Tuskegee was burned. The books thus bought by him, or a great many of them, were marked *Gunn & Strange,* and a great many *G. W. Gunn.* When Strange went on the bench, in 1867, witness took the library, on account of Strange's indebtedness to him, and on account of having bought the books, or very nearly all of them, with his own funds ; and he has had possession of them from that time to the present, claiming them as his own individual property. When witness moved to Opelika, several years ago, he took the books with him ; and having again returned to Opelika, from Tuskegee, about the first of the present year, he had carried back some of the books with him, and the balance of them were taken from the office. Witness had referred to the books, in the presence of Judge Strange while living, as his own, as his library ; from which there was no dissent on the part of said Strange, and no assent ; and said Strange had called it his (Gunn's) library, in Opelika, in the presence of witnesses. Witness had been in the entire and exclusive possession of said books, from 1867, to the present time, except some which had been taken from his office without his knowledge, claiming them as his own, as above stated. Said partnership was dissolved in 1867, by Judge Strange going on the bench ; and there had never been any settlement whatever of the partnership business. Judge Strange died in February, 1875. He was largely indebted in 1867, and afterwards. Witness, according to his best recollection, told Benjamin Strange, the administrator, that he claimed the books. *Benjamin Strange,* the administrator, testified that he had heard said decedent, about the time when he went on the bench in 1867, tell John Strange,

[Strange v. Graham, adm'r &c.]

his son, that he gave him his interest in the library; that there was no delivery of the books to John Strange; that Gunn refused to acknowledge that John Strange had any interest in the books, and claimed them as his own property; and that the books have been in the possession of said Gunn, from that time to the present.

"This being all the evidence in relation to said books, the court charged the administrator with one-half the value of the library in the possession of said Gunn, of books marked *Gunn & Strange,* and *Strange;* the same being assessed by the court at $750, as the value of said half interest. To this ruling of the court, so charging him, the administrator excepted.

"As to the rent of the plantation, known as the 'Tate place,' with the rent of which the creditors sought to charge the administrator, the following was the evidence. The creditors proved, by the said administrator, that said plantation was property which had been decreed by the Chancery Court, as a fee, to said Gunn & Strange; that the members of said firm (George W. Gunn and said decedent) made a gift of said land to their children," naming them; "that the title never was in Gunn & Strange, but was made directly to the above-named children, in June, 1873, by the parties who had the legal title; and the deed itself was read in evidence, as follows," setting it out. "Said administrator testified, also, that ever since said deed was made he has always treated and claimed said land, and does now treat and claim it, as the property of John W. Strange and himself, and not as the property of their said father's estate; that said gift was *bona fide,* and not intended to defraud any one, but no consideration was paid for the land by him or said John Strange. The administrator proved, that he was the Benjamin Strange named in the deed, and was a son of said decedent; that the grantees in said deed had divided said land between them by agreement, and he and John Strange held their half jointly; that they rented their portion of the land, in 1874, for two bales of cotton, receiving each one bale in December, 1874, during the life of their father, which was sold at 26 cents on or about the 27th February, 1875; that he tried to rent said land in 1875, but could not, and had only got the fencing &c. repaired; and that he had cultivated said lands himself the present year, 1876. It was in evidence, also, that said decedent, at the time of the execution of said deed, owed the following creditors, whose debts had not been subsequently paid," stating their names, and the amounts due to them respectively; "but the debts of all the other creditors had accrued subsequently. George W. Gunn

testified, for the administrator, as follows: Said decedent and witness gave the lands described in said deed to their children, as an advancement. It was not made with the view or purpose of defrauding, but simply as a gift to their children. Witness and said decedent acquired an interest in said land by reason of their having formerly been equal partners in the practice of the law, but they never had the legal title to the land in themselves: it was made directly to their children, as shown by the said deed. At the time of said gift, the decedent was the judge of the ninth judicial circuit, and had received a salary of $3,000 *per annum* for four years, and received said salary for two years afterwards. This being all the evidence relating to the said 'Tate place,' the court thereupon charged the administrator with the following rents for said plantation: for 1874, the two bales of cotton received by him and John Strange as rent, in December, 1874, value proved to be $130; for 1876, two bales of cotton, $100. To said rulings of the court the administrator promptly excepted.

"As to the rent of the 'Ray place' for 1875, the following was the evidence: The creditors proved that said decedent cultivated said plantation during the year 1875, and that the rent of the place for that year was worth $150. In behalf of the administrator, his own account for settlement was introduced, showing that he had accounted for two bales of cotton, as rent of said place for that year. The administrator further offered to prove, as a fact, how he held the place for 1875, and what rent he had contracted to pay. The court asked the administrator, at this point, with whom the contract was made; to which he answered, that it was made with the decedent; and the court thereupon refused to permit him to state the terms under which he held said place in 1875, or to state, as a fact, what rent he had agreed to pay for the same that year; to which ruling of the court the administrator excepted. This being all the evidence on this item, the court thereupon charged the administrator with $125, as rent for said place; to which the administrator excepted.

"Regarding the rent of said 'Ray place' for the year 1876, the evidence was as follows: The creditors introduced the following processes," setting out the following writs: 1st, a *venditioni exponas*, dated the 2d November, 1875, commanding the lands to be sold under the levy of an execution, described as made on 22d June, 1874, and 22d January, 1875, which execution was issued on a judgment for $200, besides costs, rendered by the Circuit Court of said county, on the 12th March, 1868, against said decedent, and in favor of E.

[Strange v. Graham, adm'r &c.]

M. Erwin; 2d, another *venditioni exponas*, of the same date, commanding the lands to be sold under the levy of another execution, made on the same day as the former, issued on a judgment for $121.35, rendered by said court on the 15th September, 1866, in favor of J. A. Spear, and against said decedent. "Said processes were introduced to show that they were void, and of no effect to convey the said land out of the estate; and to their introduction for that purpose the administrator objected, and excepted to the overruling of his objection. The sheriff of said county testified, in behalf of the administrator, that he had sold said lands, under said process, to T. B. Dryer. Said writs were issued on judgments rendered against said decedent in his lifetime, on which liens had been regularly kept up. The administrator offered to show that, although said writs did not show that the sheriff had given said L. B. Strange personal notice, by serving him with a copy of the execution, yet, in fact, it had been duly given. The court refused to allow this to be done; to which ruling the administrator excepted. Said Dryer testified, that he bought said lands at the sheriff's sale, which was made in December, 1875, and received the sheriff's deed for the same; that he bought said lands for B. Strange, conditionally; that after the sale, he demanded the land of the administrator under and by virtue of the sheriff's deed, and received the possession from the administrator about the first of 1876; and that he had rented said lands this year, 1876, for three bales of cotton, through his agent, said Benjamin Strange. The administrator testified, for himself, that he delivered the possession of said lands to Dryer in good faith, on his demand of possession, thinking that said Dryer had a right to the place under said sale; that said Dryer has rented out said place this year for three bales of cotton; and that he, said administrator, had received no rent for said land this year. This being all the evidence in relation to said item, the court held that said process was null and void, and conveyed no title out of the estate, and that the administrator was responsible for the rent, as though the sale had not taken place; and charged him with $150, as rent of said place for 1876. To these rulings of the court the administrator excepted. The execution docket of said Circuit Court was also introduced," showing the regular issue of executions on said judgments above described.

The several rulings of the court to which, as above stated, exceptions were reserved by the administrator, are now assigned as error.

W. C. BREWER, for appellant.

ABERCROMBIE & GRAHAM, with J. A. BILBRO, *contra.*

STONE, J.—On the testimony disclosed in this record, we can not learn that any partnership dealings were had between Gunn & Strange, after the dissolution of the firm in 1867 or 1868, by the election of the latter to the circuit bench. All the testimony bearing on the question shows that, from that time, to the death of Judge Strange—more than six years afterwards—the law books of Gunn & Strange were in the individual possession of Gunn, he claiming and exercising acts of ownership over them. This, in the absence of other proof, operated a bar of all claim by Strange, or his administrator, to share in said books.—*Bradford v. Spyker,* 32 Ala. 134.

2. There is another reason, why the administrator should not have been charged with half the value of the books, on the evidence before the court. The books were assets of the firm, if the proof showed that Strange owned any interest in them. Gunn had a lien on them, if the firm owed Gunn, or owed other debts, for the payment of which, as between Gunn and Strange, the latter was bound to contribute. Gunn being the survivor, the legal title to the personal assets was cast on him ; and the administrator of Strange could recover from him only his interest in the remaining effects, after all the debts of the firm should be paid, and the accounts of the partners *inter sese* adjusted and settled.—*Donelson v. Posey,* 13 Ala. 752 ; *Houston v. Stanton,* 11 Ala. 412 ; *Edgar v. Cook,* 4 Ala. 588.

3. While the gift of the lands known as the "Tate place," by Gunn and Strange to their sons, may have been a constructive fraud, and inoperative against debts then due from them, the administrator of Strange, as such, had no power to reach and subject such property. Only the creditors of Strange could reach this property.—*Marler v. Marler,* 6 Ala. 367 ; 2 Brick. Dig. 16, § 45.

4. The record shows, that the lands known as the "Ray place" were sold under orders of sale issued after the death of Judge Strange, but in continuation of executions regularly kept up from a period anterior to his death. The fact that the sale was thus made after his death, does not avoid the sale.—*Hendon v. White,* 52 Ala. 597. Nor does the fact that the sale was made under writs of *venditioni exponas,* and without giving personal notice of the levy to the defendant, invalidate the sheriff's sale, when the question, as in this case, is collaterally presented.—2 Brick. Dig. 458, § 373 ; *Weir v. Clayton,* 19 Ala. 132.

5. Benjamin Strange, the administrator, was not a com-

petent witness to prove the terms of the contract, alleged to have been made between him and his intestate, as to the rent of the " Ray place " for 1875.—Rev. Code, § 2704, as amended; Acts 1874–5, page 252. He was, however, a competent witness to prove that the two bales of cotton, with which he charged himself in his account current, were on account of rent of that place for that year, if such was the fact.

For the errors above pointed out, the judgment of the Probate Court is reversed, and the cause remanded.