## COSTER'S EX'RS *vs.* BANK OF GEORGIA ET AL.

24    37
95    95
24    37
101   342

1. The assignee or endorsee of a note given for the purchase money of land, cannot stand in a higher or better position than the original payee or vendor occupied.

2. When lands are purchased by a partnership from one of its members, who pledges his entire interest in the company to indemnify it against any loss which it might sustain in the purchase, and guaranties that the land can be re-sold within five years for at least the amount of the purchase money, and the lands remain unsold after the expiration of the five years, an assignee of the notes given for the purchase money cannot assert a vendor's lien, as against a member of a company who had guarantied their payment, and had paid a part of them.

3. Nor can an assignee of the notes assert a vendor's lien as against a remote assignee of the vendor's interest in the company, who purchased *bona fide*, for valuable consideration, without notice of any such outstanding claim or equity.

4. The vendor, being a member of the company, cannot assert a vendor's lien, as against subsequent creditors, mortgagees, or purchasers, without proving that they advanced their money with notice of his lien.

5. The entire assets of a partnership are, in equity, subject to the payment of its debts.

6. Where money is loaned to a partnership on the faith of the partnership property, equity will consider the creditor, as between himself and the several partners, as a mortgagee, with a lien upon the property until his debt is paid.

7. An unrecorded mortgage is void, under the acts of 1823 and 1828, as to a subsequent mortgagee without notice, although his deed is also unrecorded.

8. When the legal title to real estate belonging to a partnership is vested in one of its members, the lien acquired by a judgment against him individually, in favor of a creditor of the company, is subject to the equities already existing over the property; and a judgment against the company itself would not operate as an efficient lien on the land.

9. In a contest in equity among several creditors of an insolvent partnership, for the marshalling of its assets and the settlement of their respective liens, a creditor who was not made a party to the original bill may be brought in as a defendant to a cross bill.

10. Where non-resident infants are necessary parties to a bill, the record must show that publication as to them was made in the manner prescribed in the third and forty-first rules of our Chancery Practice.

ERROR to the Chancery Court of Russell.

Heard before the Hon. W. W. MASON.

THE facts upon which the complainant's original bill was

filed may be thus briefly stated: In 1836, a company was formed, consisting of James Hamilton, James L. Pettigru, J. C. Vaughan, John G. Coster, and A. E. & C. Hexier. The objects of the association were, originally, to buy and sell lands on speculation, but afterwards the company engaged in the cultivation of cotton, and this formed a part of its regular business. The original intentions of the associates were, to confine the operations of the association to dealings in Mississippi lands; but the company, during its progress, purchased property in Alabama and Georgia, and engaged largely in the cultivation of cotton in Russell County, Alabama. The interests in the company, amongst the above named associates, were as follows: James Hamilton one fourth; James L. Pettigru one fourth; J. C. Vaughan one fourth; John G. Coster one eighth; and A. E. & C. Hexier one eighth.

After the formation of the company, in 1836, and after the interests of each of the parties had become distinctly defined, it was resolved by the company to vary its operations to some extent, and to engage in the cultivation of cotton. For this purpose, John G. Coster, the member of the company owning one eighth interest, agreed to advance to the company $100,000, to be invested in negroes for the use of the company, and in order to enable it to carry out its enterprise in the cultivation of cotton. About this time, say the 16th day of November, 1836, all the associates join in a deed, by which they convey all the property then on hand to James Hamilton, one of the associates, to be held in trust for the benefit of the company, and by which deed the said Hamilton is constituted the general agent and organ by whom the transactions of the company are to be carried on; and by the same deed all the property then of the company, and all that it may acquire in future, is pledged to John G. Coster, for the reimbursement to him of the money which he has advanced to and for the benefit of the company. This instrument seems to have been signed by all the parties who were associates at that time. A lot of slaves was purchased of one Middleton, and the title conveyed to Hamilton, in pursuance of the arrangement made by the preceding deed. It appears that the association actually commenced planting

in Mississippi, but not being satisfied with their success there, or for some other reason, the planting in Mississippi was abandoned, and the negroes and planting material were removed to Russell County, Alabama, where the association commenced planting.

The name which the association had taken, at its first formation, was, "The Mississippi Land Company"; but the location which was selected by the association for its planting operations in Alabama, being the Oswichee Bend, on the Chattahoochee River, the association, after its said location, assumed the name of the "Oswichee Company."

This removal and new location to the Oswichee Bend in Russel County, Ala., was in the spring of 1837. At this time one Jerry Cowles became a member of the association, and it seems to have been from him that the association purchased the lands which they proposed to cultivate in cotton on the Oswichee Bend. Cowles, by a conveyance from Hamilton and others, becomes interested in the concern to the extent of one fifth of the whole. The deed by which he becomes interested in the concern stipulates that the deed of 16th Nov., 1836, by which the property was conveyed to Hamilton, in trust for the company, and for the reimbursement of J. G. Coster, and Hamilton created the general agent of the association, is made part of the deed creating the said Cowles a member of the said association, and the same trusts in favor of the said J. G. Coster are declared in the last as in the first deed. The deed creating Cowles a member of the association is dated the 26th of April, 1837.

On the 24th day of July, 1837, Vaughan, who owned one fourth in the whole company, sold out to Hamilton and Pettigru his interest in the concern; and they, with their wives, on the 22d day of May, 1838, sold the same interest to the other partners, being then John G. Coster, A. E. & C. Hexier and Jerry Cowles; and thus making, in effect, as to the parties to the association, simply an exchange of Vaughan for Cowles, as at this date the three members of the association, Hamilton, Pettigru and Cowles, each owned one fourth of the concern, John G. Coster one eighth, and A. E. & C. Hexier one eighth.

On the 1st of April, 1838, the association, by Hamilton, its agent or organ, bought of Jerry Cowles thirty thousand acres

of land, lying in several of the counties in Georgia, for which they agreed to give the price of $150,000. The payments were made to Cowles by the bonds of Hamilton, guarantied by John G. Coster. These bonds were executed and delivered according to their agreement. Cowles, however, on the sale of this land to the association, guarantied to them that within five years they should be enabled to sell the land for as much at least as they had given him for it, and in case it did not sell for a sum sufficient to indemnify the company, that then he would make good to them any loss which they might sustain; and he pledges his whole interest in the association to make good this covenant. The half of these bonds, the purchase money for the thirty thousand acres of land bought of Cowles, was paid by the company. The other half, with a large amount of interest, was paid by the complainants, executors of John G. Coster.

Jerry Cowles, on the 6th day of April, 1840, conveys his interest in the company to the Hexiers and Hamilton, and this seems to have ended his (Cowles') connection with the association. On the 17th day of March, 1842, the Hexiers conveyed their interest in the association to John G. Coster, and the latter conveys his entire interest in the association to his son, G. H. Coster, who, in his turn, conveys to one Gibbs, and the said Gibbs, in 1845, conveyed the interest to the complainants, executors of John G. Coster, who had in the meantime died. On the 22d of September, 1846, Hamilton conveys all of his interest to the complainants, as executors; and on the 4th day of December, 1846, Pettigru conveys all his interest in the company to the said complainants, executors as aforesaid; the said executors thereby becoming sole proprietors of the lands and slaves, the property of the company.

It seems, when Cowles sold out his interest in the company to Hamilton and the Hexiers, the said Hamilton gave him three notes dated the 6th of April, 1840, one for the sum of $1900, payable on the 1st day of May, 1841; and two other notes dated as aforesaid, for the sum of $2500, each, one payable on the 1st day of May, 1842, and one on the 1st day of May, 1843, and all of said notes drawing interest from date at the rate of 7 per cent. per annum. These notes are represented in the present proceedings by Joseph Washburn, who claims them by regular endorsement in the course of trade from Cowles.

In the winter of 1840, and before Jerry Cowles retired from the association, the company, being in want of money, authorized their agent, Gen. Jas. Hamilton, to borrow money to the extent of $50,000 in South Carolina and Georgia, and to pledge the property of the company as security for such loan. In pursuance of this authority, Gen. Hamilton addressed himself to the State Bank of Georgia, and proposed to borrow $12,500, exhibiting his authority from the company, and proposing to pledge the property of the company as security, in pursuance of the authority. The State Bank of Georgia accept the proposition of Hamilton, and loan the money. Hamilton, it seems, prepares the deed of mortgage, or the instrument of writing found in pages 447-8 of the record, but, for some reason or other, (not disclosed in the record,) this instrument was not delivered, in fact, until 1847, when the agency of Hamilton had ceased and the company was in liquidation.

On the 7th day of July, 1840, the members of the association, at that time consisting of John G. Coster, Chas. A. Hexier and E. Hexier, J. L. Pettigru, and James Hamilton, unite in constituting the said James Hamilton their agent and attorney in fact, with a special written power for that purpose, to go to Europe for the purpose of negotiating a loan for the company, and clothed with power to mortgage in the name of the company the property of the company as a security for the repayment of the money realized by the said loan. Clothed with this power, the said Hamilton went to Europe and negotiated, through Messrs. Hope & Co., of Amsterdam, a loan for the sum of $225,000, on the sale of two bonds made and executed by the individual members of the said association, for the sum of $112,500 each; and to secure the faithful payment of these bonds, the said Hamilton executes a mortgage on all the property of the said company. The mortgage is to Hope & Co. alone, but at the time that the mortgage is executed, only one of the bonds for the sum of $112,500 had been negotiated to Hope & Co. But a stipulation is made in the mortgage, that if Hope & Co. conclude to take the second bond, or if they procure its negotiation, the mortgage shall be a common security for both of the bonds. In pursuance of this arrangement, Hope & Co. induced the house of Solomon Heine, composed of Solomon and Carle Heine, to take the last named bond, and they took it,

4

relying upon the mortgage security in the hands of Hope & Co.; and the latter house endorsed to them the said bond, and they hold as assignees of the said Hope & Co. Solomon Heine has since died, and Carl Heine is shown to be his sole surviving partner, as well as the sole heir to his estate.

Thus far, this is a simple narrative of the material events in the history of the company, as extracted from the record.

The record presents the following facts in the history of the pleadings :

First, Washburn filed an original bill, alleging that James Hamilton was individually indebted to him in the promissory notes above named, describing them as made by said Hamilton individually ; that the consideration of said notes was land sold by Cowles to Hamilton, and that Cowles had a vendor's lien which enured to him by reason of his holding the notes in the usual course of trade; and he prays that an account be taken, and that a vendor's lien be declared, and the land sold to pay his debt.

James Hamilton alone is made a party defendant, and a decree *pro confesso* is taken against him, and reference made to the master to take an account. The notes are made exhibits to the bill, and purport to be executed by said Hamilton individually ; and the lands said to have been sold by Cowles to him, set out in another exhibit to the bill. It does not appear when this bill was filed ; but it appears that the counsel of Hamilton reknowledged service for him on the 14th of March, 1846.

At this point, the complainants, the Costers, executors of John G. Coster, file their original bill, setting out the history of the transactions of the company, many of which have been already detailed ; and further stating the proceedings of the said Washburn, and his attempts to subject the lands of the said company to the payment of his debt, and also the attempts of the Bank of Georgia to collect their debt, setting forth that the Bank had proceeded by attachment against Hamilton, had obtained a judgment against him, and was proceeding to sell the lands and property of the said company to pay said debt. And the said complainants allege and assert that the liens of themselves and of John G. Coster, whom they represent, are superior to the claims of Washburn or those of the Bank of Georgia, and pray an injunction against both Washburn and said Bank; and such injunction is awarded.

In this bill of the Costers, they distinctly recognize the binding obligation and superiority of the claims of Hope & Co. and Carl Heine, and pray that such superiority for said debts be established. These latter are not made parties by the bill of the Costers, but the Bank of Georgia and Washburn are.

Washburn answers the bill, and asserts the superiority of his lien to all others, and insists that he is entitled to payment before all others ; and he files a cross bill, in which he makes the same case, and makes the Bank of Georgia, Hope & Co., Carl Heine, the Costers, &c. parties. In his answer and cross bill, Washburn varies his allegations from what they were in his original bill ; as by the original bill it would seem to be an individual and private transaction between Cowles and Hamilton, while by his answer to the Costers' bill, and by his cross bill, it would seem that Hamilton dealt, not for himself, but for and on account of the company whose agent he was entirely. The evidence of Hamilton, however, contradicts this, and asserts that he dealt with Cowles in that transaction, not as agent of the company, but on his own account.

The Bank of Georgia answers the bill of the Costers, asserting the superiority of its claim to all others, and in its turn files a cross bill, in which all the other parties are made defendants. The Bank, in its answer to the Costers' bill, responds to one of the recitals of that bill relative to the judgment of the Bank against Hamilton, and insists upon its validity ; in its cross bill, it asserts the binding efficacy of its mortgage lien, and its superiority over all other liens ; but it does not assert or rely upon the lien of its judgment recovered under the attachment issued against Hamilton. Indeed, the case made by the cross bill of the Bank is entirely outside and independent of the attachment or judgment lien. It alleges and proves that the Bank parted with its money on the faith of the representations of Hamilton, that he would pledge the property of the company for the security of the debt, and shows that Hamilton had ample power and authority to make such representations ; and insists that, whether the mortgage was delivered or not, as between the Bank and the members of the company, it makes no difference, as they have a lien in equity on all the assets of the company for the payment of the debt.

Hope & Co. and Carl Heine answer this bill, and insist upon

the superiority of their own lien, as they are subsequent mort-gagees for value, and *bona fide*, without notice of the claims of the Georgia Bank, whose pretended mortgage was not recorded. They also claim to be judgment creditors, because they say that the company, on the 2d day of May, 1842, confessed a judgment in their favor for the sum of $225,000; and, therefore, both as mortgagees and creditors with a judgment lien, their claim is superior to that of the Bank of Georgia and all others claiming a lien on said property; that when they parted with their money, and took the mortgage which they exhibit, they had no notice of the claim of the Bank, and made diligent inquiry for liens and incumbrances on the said property, and could find none; and to the same effect is their answer to the cross bill of Washburn.

The mortgage of Hope & Co. bears date the 24th day of December, 1840, and was acknowledged before the American consul in Amsterdam, and was placed on record in Russell County, on the 11th of February, 1841.

The Bank of Georgia claims that its mortgage is dated the 23d of January, 1840, that being the date when its loan to the company was completed, and that being the date of the paper prepared by Gen. Hamilton, although not delivered until some time in 1847, making the date of their lein older in point of time than the lien of Hope & Co.; and, inasmuch as the mortgage of Hope & Co. was acknowledged before the American consul in Amsterdam, it did not authorize it to be recorded: therefore both its mortgage and that of Hope & Co. must be considered unrecorded, and neither can claim priority over the other by reason of the registry acts of Alabama.

The chancellor decreed in favor of Washburn on his original bill, and dismissed his cross bill; and also in favor of the Bank of Georgia, giving it and Washburn a preference over both the Costers and Hope & Co. and Carl Heine. From this decree the Costers and Hope & Co. take their writ of error, and here assign for error the decree of the chancellor below in giving a preference to the liens of Washburn and the Bank of Georgia over their's and Hope & Co. and Carl Heine upon the funds and assets of the Oswichee Company.

The said Washburn assigns cross errors, that the chancellor dismissed his cross bill.

The Costers further assign for error, that the infants sought to be made parties by the Bank of Georgia, are irregularly made parties.

JOHN A. CAMPBELL, for Hope & Co. and Carl Heine:

The first question which arises, is as to the effect of the registration laws upon the Bank of Georgia. The act applicable to the case is found in Clay's Digest 154 § 18. Hope & Co. are mortgagees for a valuable consideration, without notice. The mortgage to the Bank was not recorded, nor at any time lodged for record. The consequence of nullity is then denounced by the statute. It is said, however, that the mortgage to Hope & Co. did not convey the legal title. The answer is to be found in the mortgage itself; its terms are, " granted, bargained, sold, aliened, conveyed and released." An action of ejectment could have been maintained on it.—1 Ala. 708 ; 10 ib. 166. Hope & Co. (and the Heines) were *bona fide* purchasers under the act of 1828, creditors under the act of 1828, (Clay's Digest 255 § 5,) and mortgagees under the act of 1823 (*ib.* 154 § 21). They are purchasers ; for a mortgage, at law, conveys the estate for a valuable consideration, and transfers the right of property and possession. The fact that the estate is defeasible, or that it is qualified, does not change the relation of the grantee as a purchaser. They are creditors ; for, in equity, the grantor may redeem, upon the payment of the debt, notwithstanding the forfeiture of the mortgage. He is a creditor, with a specific lien on the property, and is, therefore, entitled to protection against the unrecorded conveyance.—The consideration paid by Hope & Co. for the bonds described in the mortgage, was a valuable consideration. They advanced their ready money, on the faith of the security, as a valid, subsisting, unincumbered security, after full inquiry and due caution. Neither of the cases cited from 11 Ala. (781, 1067), establishes that Hope & Co. did not have the legal estate, nor pay a valuable consideration. The act of 1823, however, specifies a mortgagee, *eo nomine*, as a person entitled to protection from an unrecorded deed.

The point is made, that Hope & Co. did not have a legal acknowledgment of their mortgage, and that, consequently,

they will be postponed ; and cases are cited from 2 Johns. Ch. R. 303, and 2 Lomax 366, to show that a subsequent mortgage does not obtain the preference over a prior one, unless it is recorded. The Alabama statute does not require, as a condition of the nullity of the unrecorded mortgage, that the subsequent deed shall be recorded. The clause in the English statute of Anne, and the early Virginia and New York statutes, requiring a due record of the subsequent deed or mortgage, is not found in our statute. The nullity arises, whenever a subsequent purchaser or mortgagee has purchased for valuable consideration, without notice of the unregistered deed : Cruise's Digest, tit. Deed, ch. 29. A portion of the New York statutes do not contain the clause providing for priority according to date of registration, but are similar to our act, which avoids the unrecorded deed in favor of the subsequent *bona fide* purchaser and mortgagee ; the decisions in such cases are as we contend they shoud be in this.—19 Johns. 281 ; 2 Lomax's Dig. 370 ; 17 Ohio 226; 1 Peter's S. C. R. 552 ; 6 Barb. S. C. R. 60.

It is said that the rights of the Heines, under the mortgage of Hope & Co., is an equitable interest, and that their situation is not so good as that of Hope & Co. This cannot be true. They and Hope & Co., severally advanced the money specified in the motgage, and that security was taken for both, as holders of the two bonds described in it. As against a claimant under another mortgage, both stand in the same position, as purchasers without notice. Hope & Co. hold the legal title conveyed by the mortgage, for the joint benefit of themselves and Heines. The latter are their assignee, and occupy the position of their grantor. In the determination of the rights of claimants under the mortgage of Hope & Co. and those claiming adversely by another security, the Court of Chancery decides the question, by ascertaining the relative strength of the two mortgages. The claimants under the mortgage, whether by legal or equitable assignments, are entitled to the benefit of the legal estate ; they have a right to call for it,—a right to demand the legal, to perfect the equitable assignment.—7 Ala. 367 ; 8 *ib.* 866 ; 1 Johns. Ch. 119; 7 Cranch 69, 97; 31 Maine 28; 1 Term R. 761 ; White & Tudor's Cases 70, 85.

The Bank of Georgia claims that its position, in regard to Hope & Co., has been improved by the issue and levy of an attachment against Hamilton, and the rendition of a judgment against him personally. If this view had been taken during the progress of the cause, some outline of it would probably have appeared in the pleadings of the Bank. No reference is made by its bill to the attachment, and no reliance is placed in it upon these transactions. It is enough to say, that the decree must rest upon the allegations of the bill, and the proofs correspondent to them.—See cases collected in Reavis' Digest, 263, § 376.

As to Washburn's claim as against Hope & Co. : The above argument upon the rights of Hope & Co. against the Bank of Georgia, apply with equal force to this case. The Bank had a perfect estate, founded on a deed legally made, and the only fault in it was, the failure to place the deed on record according to the statute. It was prior, in point of time, to Washburn's equitable lien as resulting from the sale by Cowles to Hamilton. That equitable liens are displaced in favor of *bona fide* purchasers and mortgagees, is well settled, by decisions of our Supreme Court.—Houston v. Staunton, 11 Ala. 413 ; 5 Monroe 195. Miller, in his work on Equitable Mortgages, p. 120, says, that an equitable mortgage may be "invariably defeated by the creditor of the mortgagor clothing himself with the legal estate of the property mortgaged, provided he had not, at the time of advancing the money, notice of the equitable security. Thus, if the mortgagor, immediately after having deposited his deeds by way of security, execute a legal mortgage of the same property, to a person who is ignorant of the previous deposit, the legal mortgagee may effectually displace the title of the latter, although not a muniment of title accompanied his mortgage deed."

In deciding against the claim of Hope & Co., the Chancellor pronounces it void, because their mortgage was not recorded ; citing 5 Ala. 324, and 3 Stew. & Port. 397. The application of these decisions to this case, is not perceived. Supposing the act of 1828 to apply to this case, neither Washburn nor the Bank of Georgia was a subsequent creditor or purchaser. They had acquired liens, prior in point

of time, one legal in form, the other equitable, and both invalid against a *bona fide* mortgagee without notice, the first for want of registration, and the other on the general rule of equity above cited. Nothing is found in the bill of the Bank of Georgia in reference to a judgment in its favor; and the same is true of Washburn's bill. The answers of Hope & Co., however, affirm a judgment in their favor against Hamilton and others. This judgment was confessed to secure the mortgage debt, and to protect it against incumbrances. The authorities cited show that this judgment would override the dormant lien of a vendor for unpaid purchase money; and by the statute of registration, it would defeat the unrecorded mortgage in favor of the Bank of Georgia. 11 Ala. 413; 9 *ib*. 436; 6 *ib*. 301; 7 Wheaton 46; 2 Gratt. 182, 186; 3 Leigh 597. If there had been an interest in Hamilton, or in the Oswichee Company, liable to the lien of a judgment, this judgment binds it. No other judgment is before the court, in the two suits to which Hope & Co. and Heines are parties.

It is said that the lien of Hope & Co. and Heines under their judgment, is impaired, for that indulgence has been given. The lien should have been impeached for that reason, and, until it is impeached, the objection will not be noticed. Indulgence to a debtor is evidence of collusion; but it does not avoid a levy, nor destroy a lien. The question only arises where there are rival execution creditors, the one vigilant and active, the other fraudulently indulgent. From the frame of the bills in these cases, there is no rivalry between the plaintiffs and defendants, in reference to their judgments, as the plaintiffs do not affirm the existence of their judgments. We have, then, a legal mortgage,—that is, a conveyance operative to carry the legal estate,— with a judgment on the debt against all the members of the Oswichee Company, to oppose to a prior unrecorded mortgage, or a prior lien arising from a failure to pay the purchase money. Whether we claimed by the one right or the other, we should be preferred to the claims of Washburn and the Bank of Georgia. Had we nothing but our judgment, this would be our advantage; but we have a specific lien by deed, as well as the general lien by judgment, and the statutory protection in favor of judgment creditors against dormant liens.

The counsel for Washburn and the Bank of Georgia treat the act of 1828 as a modification of that of 1823, and argue that a time for recording mortgages has been reduced to sixty days. This has not been the opinion of the profession. The act of 1828, so far as concerns deeds of trust upon personal estate to secure debts, has been construed to embrace mortgages of personal estate; but it has never been decided, that the deeds of trust upon real estate, mentioned in that statute, embrace mortgages of real estate. There was a general statute on the subject of mortgages, which allowed six months for registration. The act of 1828 was designed to embrace the case of personal property under incumbrance, which was stationary in a county, there being no such statute before that time, though there was a statute providing for the registry of deeds which conveyed property coming from another State, or where the property was removed from one county to another. A deed of trust conveying personal property, is void, if not recorded in thirty days; but sixty days are given for the registration, if real estate is included. Deeds of trust are usually given by embarrassed or insolvent debtors; a mortgage is the security of solvent persons, usually given upon sales of property, or in transactions of loan and borrowing. The term 'mortgage' being used in one statute, while the other is confined to deeds of trust, the court will apply each expression to its appropriate subject. This argument was submitted in the case of the Ohio Life & Trust Co. v. Ledyard, 8 Ala. 866; but the court did not decide the question.

Hope & Co., then, have the best lien. Theirs is a legal estate; they took their mortgage without notice of the claims of Washburn and the Bank of Georgia. They are *bona fide* mortgagees, and as such entitled to notice, either in fact or by construction of law, that is, by the registry of the first mortgage. They are not affected by judgments or attachments, because the interest on which their mortgage operated was not bound by any judgment or attachment lien, and because nothing of the kind is relied on in the pleadings.

HILLIARD & THORINGTON and JOHN A. CAMPBELL, for Coster's Executors:

There is no *litis contestatio* between the Costers and Hope & Co. and Heine. The Costers affirmed, in their bill, the prior-

ity of Hope & Co.'s and Heine's claim, and did not make them parties. The Bank of Georgia and Washburn filed original bills in so far as Hope & Co. and Heine were concerned, but in the nature of a cross bill as against the Costers, Hamilton and others; they set up their liens and mortgages against the company, and against the Costers, as creditors of part owners of that company, with mortgages on the shares, and they deny the priority of Hope & Co. and Heine to satisfaction.

The only evidence given by Washburn of a lien, is found in the agreement of the counsel for Hope & Co. and Heine; and it is clear, that this admission is not evidence against any other parties. No evidence was taken by him to prove the averments of his answer, or the allegations of his cross bill, as to the consideration of the notes, or the property sold by Cowles to the company. If Hope & Co. and Heine had filed their answer, affirming on oath the truth of the facts admitted by the counsel, the answer could not be used as evidence against their co-defendants.—2 Dan. Ch. Pr. 981; 8 Porter 270; 3 Ala. 83; 4 ib. 187. Washburn's case is not only not proved, but is disproved by the evidence of the Costers.

Again; the statements of Washburn's bill and answer are wholly inconsistent and contradictory. He asserts a vendor's lien, which is entitled, as he insists, to priority over every other lien, on the ground that the notes held by him were given by Hamilton to Cowles for one fourth undivided interest in a large body of lands; while in his cross bill he asserts that the notes were executed by Hamilton as trustee of the company, in consideration of Cowles' interest in the lands and negroes of the company, and in certain other lands. The proof conclusively shows that Hamilton did not purchase as the trustee of the company, but for himself individually. The contract of sale did not convey any specific parcel of land, to which a vendor's lien could attach, but a mere interest in a joint stock company. This interest, as Hamilton testifies, was to be estimated after the payment of the debt due John G. Coster, and the other debts of the company, nor had Cowles himself any lien on the lands to convey, as he had previously relinquished by deed all his rights.—Hall's Executors v. Clarke, 5 Ala. 363. Washburn claims only as the assignee of Cowles, and can assert no other lien than that which Cowles had, if any. The sale by Cowles

to him was of his interest in the firm, and that interest consisted of a balance remaining after the payment of debts. Among these debts, thus to be paid, was that of Coster. The conclusion results, that Washburn would have no lien as against the Costers, even if the facts of his bill were established.

The claim of the Bank of Georgia is rested on two grounds : first, the judgment recovered against Hamilton in 1842 ; and, secondly, a paper purporting to be a mortgage executed by Hamilton. The attachment was sued out against Hamilton alone, and the judgment recovered against him alone ; it can, therefore, only bind his interest in the property. Hamilton's possession was that of a trustee merely, and the Bank, having recognized him as a trustee, was bound to know the extent of his authority. A judgment lien upon a trust estate cannot be enforced.—Coote on Mortgages 186. In its cross bill the Bank seems to have abandoned its reliance on the judgment lien, and sets up a pretended mortgage. This paper bears date in January, 1840 ; but the proof clearly shows that it was not delivevered until 1847, when Hamilton was no longer trustee of the company, and when he had no interest whatever in it. Delivery is essential to the validity of a deed of any kind ; so long as the grantor or mortgagor retains possession of the paper, without ever having delivered it, the gift or conveyance is imperfect, and the deed is void.—Frisbie v. McCarty, 1 S. & P. 56. The paper is, also, fatally defective in the manner of its execution : it is not executed in the name of the company, but is signed by Hamilton as an individual.—5 Peter's R. 349 ; 23 Wendell 435 ; 4 Hill 357.

There are, also, errors in the manner in which parties have been made, to the bills of both Washburn and the Bank : The infant heirs of Coster are made defendants to the Bank's cross bill ; but the copy of the advertisement was sent to persons called trustees, instead of being sent to the persons designated in the rule.—Clay's Digest 612, Rules 3 and 41 ; 16 Ala. R. 509 ; 6 Ala. R. 452 ; 5 Ala. R. 158 ; 1 Ala. R. 379. The same error is found in the orders of publication made on Washburn's cross bill. And the recitals in the decretal orders do not show a compliance with the decretal orders. The demurrers to the cross bills should have been sustained because Hope & Co., with whom was the main controversy on the cross bills,

were not parties to the original bill; and for the further reason, that the matters of the cross bill did not grow out of the original bill, but were independent of it.—3 Dan. Ch. P. 1742; 15 Ala. 501.

JOHN E. WARD, JAMES E. BELSER and N. HARRIS, for the Bank of Georgia :

On the 23d of January, 1840, Hamilton borrowed $12,500 from the Bank of Georgia, for the benefit of the Oswichee Company, and on the faith of its property. This debt was contracted while the Bank was ignorant of the equities existing between these parties, and while Hamilton had the exclusive control and management of all the interests of the company, and was held out to the world as its agent. Independent, then, of all questions of copartnership, mortgages and judgments, the property of the company is liable for the payment of this debt. —Story on Agency 55, 84, 115, 116, 117, 118, 451 ; 1 Kelly 428 ; 6 Ga. R. 171 ; Angell and Ames on Corporations 178 ; Story on Contracts 189 ; Hill on Trustees 425. In his capacity as agent, Hamilton incurred debts which were paid by Coster; he purchased lands from Jerry Cowles, giving him an interest in the association, without the knowledge of the other parties in interest, all of which acts were subsequently ratified by them. In this capacity, Hamilton gave the bonds of the company to Cowles, the payment of which was subsequently guarantied by John G. Coster; in this capacity, Hamilton purchased from Pettigru forty-nine negroes, and a large number from Middleton ; and the entire record exhibits Hamilton as the sole manager of this whole estate. In addition to this, the legal title to all this property was in Hamilton. That the trust property is responsible for goods furnished, or for debts contracted on the faith of that property, see 4 Dess. 19, 591; 1 McCord's Chan. 267 ; R. McCharlton's Rep. 376 ; 9 Ga. Rep. 223.

But the relations existing between these parties created a partnership, and the debts of that partnership must be paid, before a court will consider the rights and equities existing between the parties themselves. That a partnership was created among the parties, see Story on Partnership 1, 2, 4, 39, 606 ; 3 Kent's Com. 27, 28 ; 8 Ga. Rep. 285. And that the

partnership debts must be paid, before a court will regard the rights and equities existing between the partners, see 3 Kent's Com. 26; Story on Partnership 606 §§ 77, 410; 2 Story's Equity § 1253.

But it is alleged, that the Bank has abandoned its claim on the partnership property, by proceeding by attachment against Hamilton alone. The legal estate was in Hamilton alone, and against him alone could a judgment be obtained to bind it.— Clay's Digest 350 § 31; Story on Partnership § 92; 2 Story's Equity § 1207.

In the consideration of the written and express authority of the 1st January, 1840, and the mortgage given by Hamilton to secure the payment of the debt contracted by that authority, a question of fact is presented : Is that paper genuine, and was the money borrowed by Hamilton under it? These facts are so clearly proved by the evidence, that "the probation bears no hinge nor loop to hang a doubt on." But it is contended, that, notwithstanding the proof of these facts, no lien is created, because the mortgage was not signed by each one of the parties, *per* James Hamilton, their attorney. This doctrine is undoubtedly true, where the party signing is acting only as agent or attorney; but the principle does not apply in this case, because the legal title and estate were in Hamilton.

The deed having been executed, the court will presume a delivery.—Gresley's Eq. Ev. 371. No proof of an actual delivery is now required.—4 Kent 455; 1 Edw. Ch. 497; 5 Humph. 411, 412; 3 Mason 401. There was an agreement to deliver, and equity will consider that as done which was agreed to be done.—1 Story's Equity § 64 g. The record shows an agreement, placed there by the solicitors of the plaintiffs in error, and the court will hold the parties bound by it.—Story's Eq. Ev. 39.

Hope & Co. were proper parties to the cross bill filed by the Bank, because it was necessary that all parties having any interest should be before the court.—Story's Eq. Pl. § 72; Clay's Digest 352 § 44. A cross bill is in the nature of an original bill, and there is no ground of demurrer to such a bill which will not hold to an original bill.—Story's Eq. Pl. §§ 628, 629. If Hope & Co. are improper parties, not being within the jurisdiction of the court, it is no cause of demurrer on their

part, because the decree would not have been binding on their interests if they had not appeared.—Story's Eq. Pl. § 544; 5 Geo. R. 596. This argument applies to all the parties who were brought in by publication; they are not bound by the decree, and therefore cannot complain on error that they were not properly put in default. Again; no such point was made in the court below, and it is therefore no ground of error:

The parties, then, being properly before the court; the question arises, how are the claims on the fund to be paid. The claim of the Bank against the Costers has already been considered. The claim of Washburn, however just, is secondary to that of the Bank, because, without mentioning other reasons, Washburn's notes are dated subsequent to Cowles' authority to Hamilton to borrow from the Bank, and consequently, the loan being effected on the faith of all this property, at the time the debt was contracted, the vendor's lien and every right that Cowles had were pledged for its payment. The Bank, then, held an equitable lien on this property, which would require its debt to be paid in preference to all other debts existing at the time. On the 7th of July, 1840, a power of attorney was given to Hamilton to borrow money in Europe. On the 19th of October, 1840, the two bonds for $225,000 each were executed. On the 24th of December, 1840, a mortgage was given by Hamilton to secure the payment of these bonds; this mortgage was recorded in Russell County on the 11th of February, 1841, but its record was of no force, because it was not so executed as to entitle it to be recorded.—Clay's Digest 153 §§ 255, 256; 7 Geo. R. 531, 533. And as no constructive notice was thus given to the Bank, so no actual notice was brought home to it. The Bank, then, has the oldest equitable lien, which is void only as to creditors and subsequent purchasers.

Hope & Co. are neither creditors nor subsequent purchasers. That they are not creditors, within the meaning of the statute, see 11 Ala. R. 691, 694. They are not subsequent purchasers, because, to make them such, the legal title must have passed to them.—11 Ala. R. 1081, 1083. In giving effect to a deed, the law will carry out the intention of the parties.—11 Ala. R. 781. It was never the intention of the parties in this case to pass the legal title, but only to create a security. The legal title does not pass from mortgagor to mortgagee at the execution

of the mortgage.—4 Kent's Com. 160 n; 1 Kelly 193; 10 Geo. R. 73; 19 Ala. R. 758; 8 Ala. R. 706; 3 S. & P. 406. A subsequent unrecorded mortgage, when the first mortgage is not recorded, acquires no lien superior to the first; they are both but equitable liens, and the oldest equity will prevail.— 1 Story's Equity 419, 420; 2 Johns. Ch; R; 603; 2 Lomax 366,

An attachment against Hamilton was levied on this property on the 18th of March, 1842; and a judgment thereon obtained against him on the 17th of October, 1842. This was the proper judgment to bind the property, because the legal title was in him.—Strong on Partnership § 62; 2 Story's Equity § 1207; Clay's Digest 350 § 31. The Bank, therefore, as against the unrecorded mortgage of Hope & Co., and without actual notice of that mortgage, is a creditor, within the legal acceptation of that term, as against whom said mortgage is void.

The judgment confessed in favor of Hope & Co.. on the 2d fo May, 1840, can give Heine no lien, and is void as to Hope & Co., because colorable in part.—9 Ala. R. 305, 311. But the lien of the Bank's attachment exists from the 18th of March, 1842, the time of its levy, and is, therefore, the oldest lien.— 8 Ala. R. 813, 616, 617. The judgment was suspended by Hope & Co., and their lien thus lost.—15 Ala. R. 18, 128. This judgment was confessed by Hamilton to protect the property from the pursuit of other creditors, and is therefore fraudulent and void. Hamilton was the only representative of Hope & Co., in their assent to this judgment, and, without the consent of the parties, a judgment taken at the first term is void. Hamilton's letter, therefore, is evidence of the understanding and agreement under which this judgment taken.

This property is the only property subject to the Bank's claim, while Coster's whole estate is liable for the payment of the bonds to Hope & Co. and Heine : the Bank, therefore, should be paid out of this fund.—Story's Equity §§ 499, 558, 633, 642.

BELSER & RICE, for Washburn :

The original bill was filed by Washburn to enforce a vendor's lien on real estate for the purchase money, and was properly filed.—Foster v. Atheneum, 3 Ala. R. 302; Roper v.

McCook, 7 Ala. 318; Connor v. Banks, 18 Ala. R. 42; Kelly v. Payne, 18 Ala. R. 373; 2 Story's Equity §§ 1 16 to 1233.

The notes on which Washburn's loan is predicated, were signed by Hamilton; the bill was filed against him, and service on him perfected; and a decree *pro confesso* was afterwards regularly taken against him.—Levert v. Redwood, 9 Porter 8; Pittfield v. Gazzam, 2 Ala. R. 325; Cowart v. Harrod, 12 Ala. R. 265; Mobile R. R. Co. v. Talman, 15 Ala. R. 472.

When a decree *pro confesso* is regularly taken, it obviates the necessity of proof in the cause.—Wellborn v. Tiller, 10 Ala. R. 306; Arnold v. Shepherd, 6 Ala. R. 299; Butler v. Butler, 11 Ala. R. 668; Hartley v. Bloodgood, 16 Ala. 233; Garrett v. Ricketts, 9 Ala. R. 529. It is of equal dignity with a judgment at law.—1 Story's Equity § 547.

A decree *pro confesso* can only be set aside by filing a full and complete answer before the hearing.—Pond v. Lockwood, 11 Ala. R. 567; Davenport v. Bartlett, 9 Ala. R. 179; Keenan v. Strange, 12 Ala. R. 290.

A vendor's lien for the payment of the purchase money of land, with a decree *pro confesso* and an ascertainment of the amount of purchase money due, is no longer a secret trust, as some of the cases in the first instance call it. To Hamilton and his associates Washburn's lien never was, at any time, secret; and the decree against Hamilton binds all the members of the company and their representatives.—1 Green. Ev. §§ 171, 172, 177, 189; Salle v. Lightfoot, 4 Ala. R. 700; 2 Hayw. 351; 9 Leigh 463; 5 Pick. 380; 9 Ala. R. 572; 1 Story's Equity §§ 405, 406.

If the decree is evidence of Washburn's vendor's lien, and of the amount due on the notes on which it is based, and Hamilton and his associates and their representatives are affected by it as evidence, then the admissions of Hope & Co. and Heine, made by their attorney, are binding, independent of Hamilton's testimony, which was taken without notice to Washburn.—1 Green. Ev. § 186; McCravey v. Remson, 19 Ala. 430.

Washburn's cross bill was improperly dismissed; it should have been retained, first, so far as it asserted a vendor's lien: and, secondly, as it protected Washburn, as a creditor of the company, against all of the members and their representatives,

and also against Hope & Co. and their transferree.—Cullum v. Erwin, 4 Ala. R. 452; Nelson v. Dume, 15 Ala. R. 501; Cummings v. Gill, 6 Ala. R. 562.

The decree in favor of Washburn on the original bill, pleadings and proof, was correct.—See authorities cited in brief for Bank of Georgia.

Washburn was a creditor of Hamilton, and of the company, at and before the execution of the mortgages. In the absence of proof, the legal presumption is, that the notes were endorsed to Washburn contemporaneously with their date, or, at all events, before any of them became due.—Pinkerton v. Bailey, 8 Wendell 600. Washburn, then, being a creditor before the execution of the mortgages, and the mortgages being unregistered, a court of chancery will not become *active* against him, and postpone him to these unregistered mortgages, especially as he has a vendor's lien for unpaid purchase money; at all events, this cannot now be done, as there is no proof to warrant it. Hamilton's evidence cannot be received as against Washburn, who had no opportunity to cross-examine him.

The pretended judgments by confession against the company are wholly invalid, either as judgments or as evidence, first, because they do not show the names of the parties, (Reid & Co. v. McLeod, 20 Ala. R. 576; 2 Missouri 207;) secondly, because Hamilton was the only defendant named in the writ who was either served or accepted service, and he had no authority to accept service for the company; and thirdly, because they are fraudulent, being for a much larger sum than was due.— Marriott v. Givens, 8 Ala. R. 712.

GIBBONS, J.—As the claim of Joseph Washburn is the one first arising upon the present record, we deem it proper to dispose of it before proceeding to the consideration of the other claims presented. The lien set up by Washburn is what is usually termed a vendor's lien for the purchase money of real estate sold, but the purchase money of which still remains due and unpaid. This is sometimes termed an equitable mortgage, in favor of the vendor, in order to enable him to realize the payment of the money for which he agreed to part with his property.

It may safely be assumed as a principle, that the assignee or endorsee of a note given for the purchase money of real estate,

cannot stand in a better or higher position than the original payee or vendor of the property. Let us inquire, then, what would be the rights of Jerry Cowles, if he was the party seeking to enforce the vendor's lien insisted upon by Washburn.—As against the Costers, who represent the claims of John G. Coster, it could not prevail, because Cowles, when he became a member of the company, recognized the right of John G. Coster to hold all the property of the company, and all that it might acquire, subject to his lien for his reimbursement for the advances which he had made; and because Jerry Cowles had pledged his entire interest in the company, to indemnify the company for any loss which it might sustain in the purchase of the thirty thousand acres of land for one hundred and fifty thousand dollars. John G. Coster had guarantied the payment of the bonds given to Cowles in payment of this one hundred and fifty thousand dollars, and the executors of the said John G. had paid of these bonds seventy-five thousand dollars, with a large amount of interest, whilst the Georgia lands, which were to have been sold within five years, according to the covenant of Cowles, without loss, are yet unsold, and all the share of the said Cowles in said company, is subject to make good to said company the said covenant.

Cowles could not have insisted upon a vendor's lien, as against the Costers, for another reason. He sold to Hamilton and the Hexiers, and they, for a *bona fide* and valuable consideration, sold and conveyed the interest which they thus acquired from Cowles to the Costers, the complainants, without notice of any such outstanding claim or equity. This would defeat Cowles' vendor's lien, even if he had shown himself in other respects entitled to one.—Houston v. Staunton, 11 Ala. 412; 5 Monroe 195.

As against the Bank of Georgia, Hope & Co. and Carl Heine, Cowles could not have asserted a vendor's lien, without proving that they advanced their money with notice of his lien. So far as respects the Bank of Georgia, we find the name of Cowles signed to the paper which authorized Hamilton to borrow the money and pledge the property of the company as a security for its repayment. As respects subsequent creditors, mortgagees or purchasers, Cowles, or Washburn who claims through Cowles, would have to establish the fact that such subsequent purchaser, mortgagee, or creditor became such with full notice

of his existing equity over the property, before he could prevail against their rights.     We look in vain through this whole record, to find any evidence on which the claim set up by Washburn can rest with any plausibility.  The decree of the Chancellor was right in  dismissing his cross bill, and he should also have dismissed his original bill.  We do not deem it important to notice the question of practice as to the different cases presented by the original and cross bills, as, in our opinion, neither the one nor the other presents any case to be entertained in a court of equity as against the Bank of Georgia, the Costers, or Hope & Co. and Carl Heine.   This bill is, therefore, dismissed with costs.

The question next arises as to what are the comparative merits of the  claim of the Costers and  that of the State Bank of Georgia.

From a careful inspection of the deeds and exhibits appended to the bill of the Costers, showing the objects and the various transactions of the company, we have come to the conclusion that the members of the association, constituting the " Oswichee Company," were partners so far as third persons were concerned.   It is true, the partnership was a peculiar one ; but still they were undoubtedly so far partners that the whole assets of the company would, in equity, be considered as pledged for the payment of the debts of the company, and the debts of third persons would have priority over the debts of its individual members. —Story on Part. §§ 606, 410, 77.

The evidence in the record, we think, necessarily induces the conclusion that the agent, Hamilton, had ample authority to borrow money for the company, and to pledge or mortgage the property of the company as a security for the faithful payment thereof.   This authority has the names of all the members of the company at the  time affixed to it, that of John G. Coster amongst the others.   This authority was shown to the Bank by Hamilton at the time he borrowed the money, and was, according to the testimony, influential in causing the Bank to part with its money and make the loan.    We think the inference entirely legitimate, from the bill of the Bank and the proofs upon the subject, that the Bank parted with its money upon the understanding that it was to have a lien of some  kind upon the property of the company for its security, or a pledge of some kind of the property for the same object.  Else why should

Hamilton have drawn up the paper in the form in which it now appears, and let it lie amongst his papers for several years without its being delivered. We consider then the fact as established, that the Bank loaned its money upon the faith of the property of the company, and not upon the credit of the individual members thereof, through whom the negotiation was effected; and so far as the members of the company are concerned, the Bank is to be considered a mortgagee of the property of the company for the security of their debt, and this on the principle, that equity will consider that as done which ought to be done. See Story's Equity 64 g.

This view would place the claims of the Bank of Georgia above those of the Costers, as the latter represent John G. Coster and the claims which they have paid as executors since the death of the said John G. In the view of the case that we have taken, we deem it entirely unimportant whether the counsel of the Costers, Mr. Johnson, is held to his admission that the paper, No. 6, which is one of the exhibits to the cross bill of the Bank of Georgia, and which purports to be the mortgage itself of the Bank, was executed and delivered at the time it purports to have been or not. We do not rest the claim of the Bank upon this admission, but upon the fact that the Bank trusted the company, loaned its money on the faith of the property of the company ; and as between the Bank and the members of the company, equity will consider the Bank as mortgagees, with a lien upon the property of the company until its debt is paid.

We see no error, however, in the court's holding counsel to the admission which they had made relative to the execution of the paper in question; but, in our opinion, with or without such an admission, the law would have been the same. Our conclusion, therefore, is, that the Bank of Georgia, so far as its claim is concerned, as compared with the Costers, has the better right, and to that extent the Chancellor below correctly decided the law.

We next present the claims of the Bank of Georgia in juxtaposition with those of Hope & Co. and Carl Heine, with a view of determining their relative superiority.

It is contended on the part of the Bank of Georgia, that, inasmuch as the mortgage of Hope & Co. and Carl Heine was irregularly recorded, being acknowledged before the American consul in Amsterdam, and such an acknowledgment not authorizing

the same to be recorded, therefore it is to be considered in all respects, so far as the Bank is concerned, as unrecorded; and that being unrecorded, and subsequent in point of time to the mortgage of the Bank, it is a mere equitable lien upon the property, and therefore inferior to the lien of the Bank. To this it is replied, that the mortgage of Hope & Co. and Carl Heine is in all respects a regular legal mortgage; that its execution and delivery are perfect; its consideration *bona fide*, and that they, the mortgagees, loaned their money without any notice whatever of the mortgage set up by the Bank, and therefore claim that the penalty of nullity is denounced by the statute against the mortgage of the Bank, so far as Hope & Co. and Heine are concerned; and therefore they claim to hold priority, as between their claim and that of the Bank of Georgia.

We deem it of some importance to regard for a moment the forms of the two conveyances, under which Hope & Co. and Heine and the Bank claim. The instrument in writing under which the Bank of Georgia claims, and the circumstances attending its execution and delivery, make it an equity merely to have their debt paid out of the assets of the company, but it does not place in the Bank the legal title to the assets or any portion of the assets of the said company; whereas the mortgage of Hope & Co. is in all respects legal and regular, except that it is acknowledged before the American consul in Amsterdam. The granting clause of the mortgage is, " granted, bargained, sold, aliened, conveyed and released;" and it was regularly executed and delivered, but irregularly acknowledged and recorded. By the mortgage of Hope & Co. the legal title passed, and after the law day ejectment would lie. The question then arises, what is the effect of our acts of registration upon the two instruments by which Hope & Co. and the Bank of Georgia claim? and how do the said acts affect the one in reference to the other?

If we apply to them the act of 1823, (Clay's Digest 154 § 18,) we shall see that the penalty of nullity is pronounced upon the mortgage of the Bank, so far as respects Hope & Co. and Carl Heine. The language of the act is, that, as against " a subsequent *bona fide* purchaser, or a mortgagee for a valuable consideration, not having notice thereof," such deed or conveyance shall be void and of no effect. That Hope & Co. are mortgagees,

is undoubted. Their claim is based upon the technical bond and mortgage. This act of 1823 makes no requirement of the subsequent mortgagee, that he must record his mortgage, or stand in the same predicament as the first mortgagee with his unregistered mortgage. The act simply declares the first unrecorded deed void, as against the subsequent mortgagee, *bona fide*, and upon valuable consideration, where such mortgage is contracted without notice of the prior incumbrance. Suppose, then, the case of two mortgages of real estate, both regular upon their face, but neither recorded, and that the last has been contracted in ignorance of the existence of the first. Can there be any doubt that the last mortgage would override the first? We consider it plain, that it would. The second mortgagee, in not recording his mortgage, runs the risk simply of being overridden by some subsequent mortgagee or incumbrancer, and in that case the statute would declare the nullity of his mortgage, and prefer the subsequent one, as it prefers his to the previous one. A different rule would prevail, if the statute gave the preference to the mortgage first recorded; but that is not so, nor does the act require the second mortgage to be recorded at all, but it pronounces the second mortgage, on its execution and delivery, if executed and received in ignorance of the first mortgage, its superior. And we apprehend the result will be the same, if we apply to these instruments the act of 1828, which speaks of deeds of trust of personal property to secure debts. Under this act, a deed not recorded for 30 days, if of personal property, and for 60 days if of real estate, is pronounced void, as against creditors and subsequent purchasers without notice. Applying this act to the two deeds under which the parties claim, we cannot perceive any difference in the result. Hope & Co., it is conceived, are, under their mortgages, creditors, if not subsequent purchasers; and the nullity of the Bank mortgage, as to them, is as distinctly declared under this act as under the act of 1823, where we are disposed to think the deeds legitimately fall. The vice of the argument of the counsel in favor of the Bank of Georgia, consists in supposing that, the latter mortgage remaining unrecorded, the mortgages in that respect stand on the same level. Whereas the truth is, that the act itself, whether we apply to them the act of 1823 or the act of 1828, makes the first mortgage null and void so far as the second is concerned,

and neither act imposes upon the second mortgage the necessity of being registered in order to give it priority over the first. In this respect our acts are different from the acts of the State of New York and Virginia, on which is founded the decision in 2 Johns. Ch. 608, and 2 Lomax's Digest 366. These acts were copied from the 2d of Anne, chapter 4th, which, after describing the kind of conveyances to which it extended, and saying that the memorials of them should be registered in the manner directed, added, that " every such deed or conveyance shall be adjudged fraudulent and void against any subsequent purchaser or mortgagee for a valuable consideration, unless such memorial thereof is registered as by the act directed before the registering of the subsequent deed or conveyance." The early registry acts of Virginia, and a portion of those of New York, contained clauses similar to the one quoted from the 2d of Anne, and making it necessary to have the second mortgage registered before nullity of the first mortgage is declared. The more modern acts of those States do not contain any such clause, and consequently the decisions in those States upon the effect of the registry acts upon the first conveyance, is to the effect that they are void as to the second, irrespective of the fact whether the second mortgage has been recorded or not.—19 John 281 ; 2 Lomax's Dig. 370 ; 17 Ohio 226 ; 6 Barb. S. C. R. 60 ; 1 Peters S. C. R. 552. This we think the true construction to give to our acts ; so that whether we apply to the mortgage of the Bank of Georgia the act of 1823 or the act of 1828, that mortgage, so far as respects Hope & Co. and Carl Heine, would be void ; and so far as this Bank is concerned, the position of Hope & Co. and Heine is in no respect changed from what it would have been if their mortgage had in all respects been recorded according to the statute. The only risk which they run in failing to record their mortgage properly, was as to subsequent creditors and *bona fide* purchasers without notice. The statute itself fixes their condition as to prior incumbrances, and the courts of the country, when called upon, must enforce it. Our conclusion, therefore, is, that Hope & Co. and Carl Heine have a lien superior to that of the Bank of Georgia, and are to be preferred to said Bank in the distribution of the funds of the company.

We have not thought proper, in this opinion, to dwell upon the

effect of the attachment and judgment obtained by the Bank of Georgia against James Hamilton individually, nor upon the effect of the judgment confessed by the counsel of the Oswichee Company, in favor of Hope & Co. Neither of these judgments, in our opinion, ought .to have any material influence in the decision of the case. It is true, the legal title of the property was in James Hamilton, but the equitable title was in the members of the company ; and under such circumstances, the lien acquired by the judgment must necessarily be subject to the equities already existing over the property.—1 Paige 279, 280 ; 4 *ib.* 9. For a similar reason, the judgment in favor of Hope & Co. v. the Oswichee Company could not be efficient as a lien, because the legal title to the land was in James Hamilton, and the judgment lien, as we understand it, only operates upon the legal title.

We have, therefore, placed our decision upon other grounds. Besides, if we could give to the attachment and judgment of the Bank of Georgia an effect superior to what we have done, it is still very doubtful if its position before the court would enable it to derive any benefit from it. The Bank filed a cross bill, and by that it is supposed to have made its case, by which it is willing to be judged. In that cross bill, its attachment and judgment are no where named or relied upon ; and the only information the court has upon this subject, from the pleadings, is, that it is stated in the bill of the Costers, and confessed in the answer of the Bank to that bill. The Bank having undertaken to file a cross bill, and not setting up this attachment and judgment therein as one of the grounds upon which it relies for its superiority, how can it derive any benefit from it so far as Hope & Co. are concerned ? As to the Costers' bill, to which the answer of the Bank was responsive, a different rule would perhaps prevail ; but as against Hope & Co. and Heine, we apprehend the Bank would be confined to the case made by their cross bill. On this point, however, we make no decision ; as we have already stated, our decision is placed upon other grounds. As to the effect of the judgment of Hope & Co., we do not deem it necessary to decide, because, even without that, we consider their lien superior to that of the Bank of Georgia, and consequently to that of all other parties before the court.

Our conclusion, therefore, is, that of the claims before the

court in this cause, that of Hope & Co. and Carl Heine stands first; that of the State Bank of Georgia, second; and lastly, that of the Costers, who only represent the stock of the company, or, in other words, who are themselves the stockholders. As to the claim of Washburn, we have already shown that it cannot be supported, and, as above stated, his bill is dismissed with costs. The decree of the Chancellor, so far as it is inconsistent with the views above expressed, is reversed, and so far as it is in accordance with them, it is affirmed. The cause must be remanded, with directions to the Chancellor to proceed with it, and distribute the funds in accordance with the views above expressed.

We think there was no error in the Bank of Georgia making Hope & Co. and Carl Heine parties to their cross bill. They had not been made parties, it is true, by the Costers, in their bill; but it is clear that they had a direct and very important interest in the litigation, and were important parties before the court. Under such circumstances, we apprehend it matters little at whose instance they are brought in. If it were necessary to have them before the court, the court would even order them to be brought in, in order to enable it to proceed to a final decree in the cause.

It is also objected, that the infant heirs of John G. Coster are not made parties in a legal mode, according to the rules of chancery practice. The will of John G. Coster is not set out, so that we cannot see whether these infants are necessary parties or not. Assuming that they are necessary parties, the third and forty-first Rules of Chancery Practice direct in what manner they shall be brought before the court. The record does not, in our opinion, furnish evidence that these requisitions have been complied with. We nowhere see in the record the evidence that the requirements even of the order of publication have been complied with, so far as these infants are concerned. If, therefore, the Bank should think it necessary to bring these infants formally before the court, we should feel compelled to decide that they were not so at present.—16 Ala. 509; 5 Ala. 158; 6 Ala. 452; 1 Ala. 379; Code 716. As the cause has to be remanded for errors in the main decree, we have deemed it important to say this much upon the point, as to the mode in which these infants have been brought before the court. In the future

proceedings before the Chancellor, the parties will have an opportunity to correct any errors of this kind wnich may be found to exist.

It but remains to add that Washburn must be taxed with the costs of this court and of the court below, so far as his bill and cross bill are concerned. He must also be taxed with his own costs in the cases of the Costers and the Bank. And the balance of the costs in this court, must be equally divided between the Bank of Georgia and the Costers, and also of the court below up to the present time; leaving the court below, however, free to make such disposition of the costs to accrue in the future proceedings in the cause, as shall be just and proper.